FILED BY **KS** D.C.

**Jul 29, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
## 21-20406-CR-WILLIAMS/MCALILEY
Case No. _____

18 U.S.C. § 371
15 U.S.C. § 78dd-2
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(2)(A)
18 U.S.C. § 1957
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)

UNITED STATES OF AMERICA

vs.

NAMAN WAKIL,

        Defendant.

_____/

### INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

### RELEVANT STATUTORY BACKGROUND

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of influencing the foreign official, inducing the foreign official to take or omit certain acts, and securing an improper advantage in order to assist those classes of persons in obtaining or retaining business for, or directing business to, any person.

2.      Venezuela's Anti-Corruption Law of April 7, 2003 (amended on November 19, 2014) prohibited public officials in Venezuela from, among other things, receiving or agreeing to receive, money, on their own behalf or through others, relating to any act taken in the course of his/her official duties or responsibilities.

## RELEVANT INDIVIDUALS AND ENTITIES

3.      Defendant **NAMAN WAKIL** was a citizen of Syria and a legal permanent resident of the United States.  **WAKIL** maintained personal and investment bank accounts at banks in, among other places, the United States, the Cayman Islands, and Switzerland.  **WAKIL** was a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

4.      Corporacion de Abastecimiento y Servicios Agricola ("CASA") was Venezuela's state-owned and state-controlled food company under the Ministry of People's Power for Food that purchased food for the people of Venezuela.  CASA was a department, agency, and "instrumentality" of the Venezuelan government as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

5.      Venezuelan Official 1 was a high-ranking official of CASA from in or around 2010 to in or around 2011. Venezuelan Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

6.      Venezuelan Official 2 was a high-ranking official of CASA from in or around 2011 to in or around 2014.  Venezuelan Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

7.      **NAMAN WAKIL** owned and controlled various companies that received funds from CASA (together, the "Wakil Food Companies"), including Wakil Food Company 1.

**NAMAN WAKIL** opened bank accounts for each of the Wakil Food Companies in Switzerland and for certain of the Wakil Food Companies in the Cayman Islands.

8.     Petróleos de Venezuela, S.A. ("PDVSA"), was Venezuela's state-owned and state-controlled oil company.  PDVSA was owned and controlled by, and performed functions of, the Venezuelan government.  PDVSA maintained a majority stake in and controlled certain PDVSA subsidiaries, including: (a) Petropiar, S.A. ("Petropiar"), a joint venture between PDVSA and an American oil company; and (b) Petromiranda, S.A. ("Petromiranda"), a joint venture between PDVSA and a Russian oil company (together, the "PDVSA Subsidiaries").  PDVSA and the PDVSA Subsidiaries, including Petropiar and Petromiranda, were "instrumentalities" of the Venezuelan government and the PDVSA Subsidiaries' officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

9.     Venezuelan Official 3 was a high-ranking official at Petromiranda during the period from in or around 2014 to in or around 2017.  Venezuelan Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

10.    Venezuelan Official 4 was a high-ranking official at Petropiar during the period from in or around 2015 to in or around 2017.  Venezuelan Official 4 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

11.    **NAMAN WAKIL** owned and controlled various companies that received funds from Petropiar and Petromiranda, directly or indirectly, relating to the provision of supplies to the PDVSA Subsidiaries, including Wakil Oil Company 1 and Wakil Oil Company 2 (together, the

"Wakil Oil Companies"). **WAKIL** opened bank accounts for the Wakil Oil Companies in the United States.

12.     Co-Conspirator 1 was a Venezuelan citizen. Co-Conspirator 1 was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

13.     Co-Conspirator 2 was a Venezuelan citizen and a relative of Venezuelan Official 2. Co-Conspirator 2 was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

14.     Co-Conspirator 3 was a Venezuelan citizen. Co-Conspirator 3 was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

15.     Co-Conspirator 4 was a Venezuelan citizen. Co-Conspirator 4 was a "person" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

16.     Co-Conspirator 5 was a Venezuelan citizen and a resident of the United States during the relevant period. Co-Conspirator 5 was a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

## COUNT 1
### Conspiracy to Violate the Foreign Corrupt Practices Act
### (18 U.S.C. § 371)

1.     Paragraphs 1 through 16 of the General Allegations Section are re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around 2010, continuing until at least September 2017, in the Southern District of Florida, and elsewhere, the defendant,

**NAMAN WAKIL,**

did willfully, that is, with the intent to further the purpose of the conspiracy, and knowingly conspire, combine, confederate and agree with others known and unknown to the Grand Jury, to commit an offense against the United States, that is:

     a.     being a domestic concern, to willfully and corruptly make use of the mails and a means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **NAMAN WAKIL,** his companies, and others in obtaining and retaining business for and with, and directing business to, **NAMAN WAKIL,** his companies, and others, in violation of Title 15, United States Code, Section 78dd-2; and

     b.     while in the territory of the United States, to willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce and do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing

acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Co-Conspirators 1, 2, 3, 4, and others in obtaining and retaining business for and with, and directing business to, **NAMAN WAKIL**, his companies, and others, in violation of Title 15, United States Code, Section 78dd-3.

## PURPOSE OF THE CONSPIRACY

It was the purpose and object of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by bribing Venezuelan officials to obtain and retain contracts and other business advantages, including obtaining payment on multi-million dollar contracts with entities and instrumentalities controlled by the Venezuelan government.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which **NAMAN WAKIL** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following conduct in the Southern District of Florida and elsewhere:

1.        **NAMAN WAKIL**, together with others, while in the Southern District of Florida and elsewhere, did offer to pay, promise to pay, authorize the payment of, and pay bribes, directly and indirectly, to and for the benefit of foreign officials in Venezuela, including Venezuelan Officials 1, 2, 3, and 4 to secure their assistance in awarding contracts and providing business advantages to **WAKIL** and his companies.

2.      **NAMAN WAKIL**, together with others, while in the Southern District of Florida and elsewhere, did discuss in person and by other means the manner and means by which bribes were to be paid.

3.      **NAMAN WAKIL**, together with others, while in the Southern District of Florida and elsewhere, used the Wakil Food Companies, the Wakil Oil Companies, and bank accounts controlled by **WAKIL** and others in the Cayman Islands, Switzerland, Panama, and elsewhere to promote the illegal bribery scheme and to conceal the nature and purpose of the proceeds of the illegal bribery scheme.

### *Bribes to CASA Officials*

4.      In or around 2010, **NAMAN WAKIL** met Venezuelan Official 1 at **WAKIL's** office building in Caracas, Venezuela. **WAKIL** agreed to make corrupt payments to Venezuelan Official 1 to obtain and retain contracts and business advantages, including disbursements of contractual payments for the Wakil Food Companies with CASA.

5.      From in or around January 2010 to in or around June 2011, **NAMAN WAKIL** received approximately $30 million through incoming wire transfers from CASA into a bank account located in the Cayman Islands held in the name of Wakil Food Company 1.

6.      In or around August and September 2010, **NAMAN WAKIL** wire transferred approximately $750,000 in bribe payments from the Wakil Food Company 1 bank account in the Cayman Islands to a bank account in South Florida for the benefit of Venezuelan Official 1. To conceal and disguise the true nature of these bribe payments, **WAKIL** provided false invoices to the bank in the Cayman Islands falsely indicating that the payments were for, among other things, logistical services and customs paperwork.

7

Case 1:21-cr-20406-KMW   Document 3   Entered on FLSD Docket 08/02/2021   Page 8 of 24

7.      In or around December 2011 or 2012, **NAMAN WAKIL** met Venezuelan Official 2 in Caracas, Venezuela.  **WAKIL** agreed to make corrupt payments to Venezuelan Official 2 to obtain and retain contracts and business advantages, including disbursements of contractual payments for the Wakil Food Companies with CASA.  **WAKIL** agreed to make the corrupt payments through Co-Conspirator 2, a relative of Venezuelan Official 2.

8.      In or around 2012, **NAMAN WAKIL** caused Co-Conspirator 1 to set up bank accounts in Switzerland for the benefit of Co-Conspirator 2 and Venezuelan Official 2.

9.      From in or around 2012 to in or around 2015, **NAMAN WAKIL** received approximately $225 million through incoming wire transfers from CASA to bank accounts for the Wakil Food Companies in Switzerland.

10.     From in or around 2012 to in or around 2014, **NAMAN WAKIL** wire transferred approximately $11 million in bribe payments from the Wakil Food Companies' accounts in Switzerland to a bank account in Switzerland controlled by Co-Conspirator 2 for the benefit of Venezuelan Official 2.  To conceal and disguise the true nature of these bribe payments, **WAKIL** provided false invoices to the bank in Switzerland that falsely stated the payments were for, among other things, logistical services and customs paperwork.

11.     In connection with the corruptly obtained contracts from CASA, **NAMAN WAKIL** wire transferred at least $50 million to his personal account in Switzerland.  From these funds in his personal account in Switzerland, **WAKIL** wire transferred at least $20 million to personal accounts in his name in Miami, which **WAKIL** used to purchase, among things, ten apartment units in South Florida, a $3.5 million plane, and a $1.5 million yacht.

### *Bribes to PDVSA Officials*

12.     In or around 2014, **NAMAN WAKIL** met Venezuelan Official 3 and Co-Conspirator 5 at **WAKIL's** office building in Miami, Florida.  **WAKIL** agreed to make corrupt payments to Venezuelan Official 3 in order to obtain and retain contracts and business advantages, including disbursements of contractual payments for the Wakil Oil Companies with Petromiranda.

13.     In or around 2014, Venezuelan Official 3 sent an email from his personal e-mail account to an e-mail account of Co-Conspirator 3 seeking payment of approximately $100,000 to a shell company account in Panama.  Co-Conspirator 3 forwarded the e-mail to an employee of **WAKIL** and, subsequently, **WAKIL** caused the payment of approximately $100,000 from Wakil Oil Company 1 for the benefit of Venezuelan Official 3.

14.     In or around 2015, **NAMAN WAKIL** received approximately $7.7 million into a bank account for Wakil Oil Company 1 in the United States in connection with a Petromiranda contract.

15.     In or around 2015, **NAMAN WAKIL** caused the transfer of approximately $250,000 from the Wakil Oil Company 1 bank account to a corporate account in the United States for the benefit of Venezuelan Official 3.

16.     In or around 2015, **NAMAN WAKIL** caused an e-mail to be sent to Venezuelan Official 4 seeking to obtain contracts for Wakil Oil Company 2 with Petropiar.

17.     In or around 2015, **NAMAN WAKIL** directed Co-Conspirator 1 to open a bank account in the name of a shell company for the benefit of Venezuelan Official 4 in Panama.

18.     In or around 2015, Co-Conspirator 3 received documents by e-mail from a close relative of Venezuelan Official 4, including the passport of Venezuelan Official 4, to open a bank account for a shell company in Panama.

19.     In or around 2015, **NAMAN WAKIL** caused Venezuelan Official 4 to approve an approximately $11.2 million contract for Petropiar to purchase pipes. **WAKIL** acquired the pipes he supplied to Petropiar from China for approximately $1.3 million, leaving an inflated amount of approximately nine times the amount of the pipes. To conceal and disguise the beneficiaries of the Petropiar contract, **WAKIL** caused the payments from Petropiar to be made to a corporate account of Co-Conspirator 4 in Miami.

20.     From January 2016 to July 2016, **NAMAN WAKIL** caused Petropiar to transfer approximately $11.2 million to the corporate account of Co-Conspirator 4 in Miami in connection with Petropiar's purchase of pipes. To further conceal and disguise the fact that **WAKIL** and his co-conspirators were the beneficiaries of the Petropiar payments, **WAKIL** did not receive transfers directly from the corporate account of Co-Conspirator 4. Instead, **WAKIL** and his co-conspirators caused multiple wire transfers from the corporate account of Co-Conspirator 4 in Miami to an account controlled by Co-Conspirator 1 in Panama. **WAKIL** and his co-conspirators thereafter caused additional wire transfers from Co-conspirator 1's account in Panama to accounts of Wakil Oil Company 2 in the United States.

21.     In or around 2017, **NAMAN WAKIL** met Venezuelan Official 4 and Co-Conspirator 5 at **WAKIL's** office building in Miami to discuss the bribe for Venezuelan Official 4 relating to the Petropiar pipe contract and purchase order.

22.     In or around 2017, **NAMAN WAKIL** caused the transfer of ownership of a condominium worth approximately $300,000 in Miami, Florida to a corporate entity controlled by a close relative of Venezuelan Official 4 for the benefit of Venezuelan Official 4.

23.    **NAMAN WAKIL** maintained ledgers of bribe payments, including $350,000 in payments made for the benefit of Venezuelan Official 3 and the $300,000 real estate transfer made for the benefit of Venezuelan Official 4.

### Overt Acts

In furtherance of the conspiracy, and to affect the objects thereof, **NAMAN WAKIL**, and others, committed the following overt acts, among others, in the Southern District of Florida, and elsewhere:

1.    In or around January 2012, **NAMAN WAKIL** caused a Swiss bank account to be opened in the name of a Panamanian company listing Co-Conspirator 1 and Co-Conspirator 2 as signatories.

2.    On or about February 13, 2012, **NAMAN WAKIL** caused an email to be sent to Co-Conspirator 2 listing outstanding payments owed to the Wakil Food Companies from CASA.

3.    On or about March 1, 2012, Co-Conspirator 2 forwarded the February 13, 2012 email to the personal email account of Venezuelan Official 2.

4.    On or about April 5, 2013, **NAMAN WAKIL** caused a wire transfer of $1,000,000 from one of the Wakil Food Company accounts to the Swiss bank account opened in the name a Panamanian company listing Co-Conspirator 1 and Co-Conspirator 2 as signatories.  The payment was for the benefit of Co-Conspirator 2 and Venezuelan Official 2.

5.    In or around 2014, **NAMAN WAKIL** met Venezuelan Official 3 and Co-Conspirator 5 at **WAKIL's** office building in Miami, Florida.  **WAKIL** agreed to make corrupt payments to Venezuelan Official 3 in order to obtain and retain contracts and other business advantages, including disbursements of contractual payments for the Wakil Oil Companies with Petromiranda.

6.      On or about July 17, 2014, Co-Conspirator 3 received an email from Venezuelan Official 3 noting bank account information to receive the payment of bribe proceeds from **NAMAN WAKIL**.

7.      On or about October 8, 2015, **NAMAN WAKIL** and members of the conspiracy caused the transfer of approximately $150,000 from an account of Wakil Oil Company 1 to an account in the United States for the benefit of Venezuelan Official 3.

8.      On or about August 11, 2016, **NAMAN WAKIL** caused a ledger to be sent by email tracking payments relating to an approximately $11.2 million Petropiar contract listing payments owed to Venezuelan Official 1, Co-Conspirator 1, Co-Conspirator 3, and Co-Conspirator 4.

9.      On or about August 16, 2016, **NAMAN WAKIL** caused Co-Conspirator 1 to receive approximately $800,000 in an account in Panama.

10.     In or around 2017, **NAMAN WAKIL** met Venezuelan Official 4 and Co-Conspirator 5 at **WAKIL's** office building in Miami to discuss the bribe for Venezuelan Official 4 relating to the Petropiar pipe contract.

11.     On or about June 29, 2017, **NAMAN WAKIL** caused another ledger to be sent by email tracking payments relating to inflated contracts received by the Wakil Oil Companies with the PDVSA Subsidiaries, including various bribes paid to officials at the PDVSA Subsidiaries.

12.     On or about March 20, 2017, a close relative of Venezuelan Official 4 sent an email to an employee of **NAMAN WAKIL** providing condominium application information related to the upcoming transfer of ownership of a condominium worth approximately $300,000 in Miami, Florida.

13.     On or about September 1, 2017, **NAMAN WAKIL** caused the transfer of ownership of a condominium worth approximately $300,000 in Miami, Florida, to a corporate entity controlled by a close relative of Venezuelan Official 4 for the benefit of Venezuelan Official 4.

14.     On or about September 1, 2017, **NAMAN WAKIL** caused an employee to send an email to a title company attaching a HUD settlement statement reflecting the transfer of the condominium in Miami, Florida, to a corporate entity controlled by a close relative of Venezuelan Official 4 for the benefit of Venezuelan Official 4.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### Foreign Corrupt Practices Act
### (15 U.S.C. § 78dd-2; 18 U.S.C. § 2)

1.     Paragraphs 1 through 16 of the General Allegations Section and paragraphs 1 through 23 of the Manner and Means Section of Count 1 are realleged and incorporated by reference as though fully set forth herein.

2.     On or about September 1, 2017, in the Southern District of Florida and elsewhere, the defendant,

**NAMAN WAKIL,**

being a domestic concern, did willfully use and cause to be used and aid, abet, counsel, command, induce, and procure the use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i)

13

influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **WAKIL**, his companies, and others in obtaining and retaining business for and with, and directing business to, **WAKIL**, his companies, and others, to wit **WAKIL** caused an email to be sent in connection with the transfer of ownership of a condominium in Miami, Florida worth approximately $300,000 on or about September 1, 2017, for the benefit of Venezuelan Official 4, in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

## <u>COUNT 3</u>
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

1.       Paragraphs 1 through 16 of the General Allegations Section are re-alleged and incorporated by reference as though fully set forth herein.

2.       From in or around 2010, continuing until at least September 2017, in the Southern District of Florida, and elsewhere, the defendant,

**NAMAN WAKIL,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with persons known and unknown to the Grand Jury, to commit an offense against the United States, that is:

a.       To knowingly, transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United

States, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A):

b.    To knowingly conduct, and aid, abet, and cause others to conduct, and attempt to conduct, financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

It is further alleged that the specified unlawful activity is the following: (a) a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (b) an offense against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv).

## PURPOSE OF THE CONSPIRACY

It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by bribing Venezuelan officials to obtain and retain contracts and other business advantages, including obtaining payment on multi-million dollar contracts with entities and instrumentalities controlled by the Venezuelan government, and to launder bribes, proceeds, and other funds related to the corrupt scheme into and through accounts in the United States in order to promote the illegal bribery scheme and to conceal the nature and purpose of the proceeds of the illegal bribery scheme.

## MANNER AND MEANS OF THE CONSPIRACY

Paragraphs 1 through 23 of the Manner and Means Section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 4
### International Laundering of Monetary Instruments
### (18 U.S.C. §§ 1956(a)(2)(A) and 2)

1.      Paragraphs 1 through 16 of the General Allegations Section and paragraphs 1 through 23 of the Manner and Means Section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about August 16, 2016, in the Southern District of Florida and elsewhere, the defendant,

**NAMAN WAKIL,**

knowingly transported, transmitted, and transferred, and aided and abetted, and caused, the transport, transmission, and transfer of, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is: (a) a violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (b) an offense against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, pursuant to Title 18, United States Code, Section 1956(c)(7)(B)(iv), that is, the transfer of approximately $800,000 from a bank account in Miami, Florida to a bank account in Panama,

controlled by Co-Conspirator 1, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## COUNTS 5-7
### Engaging in Transactions in Criminally Derived Property
### (18 U.S.C. §§ 1957 and 2)

1.      Paragraphs 1 through 16 of the General Allegations Section and paragraphs 1 through 23 of the Manner and Means Section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth in each Count below, in the Southern District of Florida and elsewhere, the defendant,

**NAMAN WAKIL,**

did knowingly engage in, and aid, abet, and cause others to engage in, and attempt to engage in, a monetary transaction affecting interstate commerce, by, though, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.  It is further alleged that the specified unlawful activity is the following: (a) a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (b) an offense against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, pursuant to Title 18, United States Code, Section 1956(c)(7)(B)(iv):

| Count | Approximate Date | Description of Transaction |
|-------|------------------|---------------------------|
| 5 | October 11, 2016 | Wire transfer in the amount of approximately $1,742,510 from a bank account of **NAMAN WAKIL** in the Southern District of Florida to an attorney escrow account in the Southern District of Florida for the purchase of an apartment in Coconut Grove at 2675 S. Bayshore, Unit 602, Miami, Florida 33133 |
| 6 | October 11, 2016 | Wire transfer in the amount of approximately $1,659,419 from a bank account of **NAMAN WAKIL** in the Southern District of Florida to an attorney escrow account in the Southern District of Florida for the purchase of an apartment in Coconut Grove at 2675 S. Bayshore, Unit 402, Miami, Florida 33133 |
| 7 | December 14, 2016 | Wire transfer in the amount of approximately $4,032,051 from a bank account of **NAMAN WAKIL** in the Southern District of Florida to an attorney escrow account for the purchase of an apartment in Sunny Isles at 18555 Collins Avenue, Unit 2605, Miami Beach, Florida 33139 |

In violation of Title 18, United States Code, Sections 1957 and 2.

## **FORFEITURE**
### **(18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1))**

1.  The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **NAMAN WAKIL,** has an interest.

2.  Upon conviction of a violation of Title 15, United States Code, Section 78dd-2, or a conspiracy to commit such an offense, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.  Upon conviction of a violation of Title 18, United States Code, Section 1956 or 1957, as alleged this Indictment, the defendant, **NAMAN WAKIL,** shall forfeit to the United

States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.    The property subject to forfeiture includes, but is not limited to:

a.   a forfeiture money judgment in the amount of at least $50 million;

b.   real property located at 3535 Hiawatha Avenue, Unit 602, Miami, Florida 33133;

c.   real property located at 68 SE 6 Street, Unit 2511, Miami, Florida 33131;

d.   real property located at 68 SE 6 Street, Unit 2911, Miami, Florida 33131;

e.   real property located at 4500 North Miami Avenue, Miami, Florida 33127;

f.   real property located at 4510 North Miami Avenue, Miami, Florida 33127;

g.   real property located at 92 SW 3 Street, Unit 4806, Miami, Florida 33130;

h.   real property located 92 SW 3 Street, Unit 5006, Miami, Florida 33130;

i.   real property located at 257 West Main Avenue, Gastonia, NC 28052;

j.   real property located at 18555 Collins Avenue, Unit 2605, Miami, Florida 33160;

k.   real property located at 888 Brickell Key Drive, Unit 1512, Miami, Florida 33131;

l.   real property located at 1010 Brickell Avenue, Unit 3509, Miami, Florida 33131;

m.   real property located at 1010 Brickell Avenue, Unit 4310, Miami, Florida 33131;

n.   real property located at 1010 Brickell Avenue, Unit 4610, Miami Florida 33131;

o.   real property located at 1010 Brickell Avenue, Unit 4710, Miami, Florida 33131; and

p.   the contents of Synovus Bank account number 05312001015335423 in the name of Wakilisimo LLC;

q.   the contents of Synovus Bank account number 07081901013876345 in the name of Naman Wakil;

    r.   the contents of United Bank (formerly known as Carolina Trust Bank) account number 0700017114 in the name of Naman Wakil and Souheil A. "Tony" Azar;

    s.   the contents of United Bank (formerly known as Carolina Trust Bank) account number 700015258 in the name of Wakil Properties LLC; and

    t.   the contents of United Bank (formerly known as Carolina Trust Bank) account number 700015266 in the name of Wakilisimo LLC.

5.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property that cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property, under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(1), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, 982(b)(1).

A TRUE BILL

_____
FOREPERSON

_____
JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

_____
JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION

_____
Michael N. Berger
Assistant United States Attorney

_____
Alexander Kramer
Trial Attorney

21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

v.

NAMAN WAKIL,

_____ Defendant. _____ /

CASE NO._____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

New defendant(s) ☐ Yes ☐ No
Number of new defendants _____
Total number of counts _____

**Court Division:** (Select One)

☑ Miami   ☐ Key West   ☐ FTL
☐ WPB   ☐ FTP

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) **Yes**
   List language and/or dialect **Spanish**

4. This case will take __10__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   |     |               |   |
   |-----|---------------|---|
   | I   | 0 to 5 days   | ☐ |
   | II  | 6 to 10 days  | ☑ |
   | III | 11 to 20 days | ☐ |
   | IV  | 21 to 60 days | ☐ |
   | V   | 61 days and over | ☐ |

   (Check only one)

   |             |   |
   |-------------|---|
   | Petty       | ☐ |
   | Minor       | ☐ |
   | Misdemeanor | ☐ |
   | Felony      | ☑ |

6. Has this case previously been filed in this District Court? (Yes or No) **No**
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No**
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No**

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**

_____
Michael N. Berger
Assistant United States Attorney
Court ID No.      A5501557

*Penalty Sheet(s) attached

REV 3/19/21

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: NAMAN WAKIL**

**Case No:**

Count #: 1

Conspiracy to Commit an Offense Against the United States

Title 18, United States Code, Section 371

* **Max.Penalty:** Five (5) Years' Imprisonment

Count #: 2

Foreign Corrupt Practices Act

Title 15, United States Code, Section 78dd-2

* **Max.Penalty:** Twenty (20) Years' Imprisonment

Count #: 3

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

* **Max.Penalty:** Twenty (20) Years' Imprisonment

Count #: 4

International Laundering of Monetary Instruments

Title 18, United States Code, Section 1956(a)

* **Max.Penalty:** Twenty (20) Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

Counts #: 5-7

Engaging in Monetary Transactions in Criminally Derived Property

Title 18, United States Code, Section 1957

* **Max.Penalty:** Ten (10) Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**