**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 21-CR-20406-WILLIAMS / MCALILEY**

**UNITED STATES OF AMERICA**

**vs.**

**NAMAN WAKIL,**

  **Defendant.**
_____ /

## DEFENDANT'S MOTION TO DISMISS, SUPPRESS EVIDENCE, AND TO DISQUALIFY, AND REQUEST FOR A TAINT HEARING

The United States of America, by and through undersigned counsel, hereby files its response to Defendant's Motion to Dismiss, Suppress Evidence, and To Disqualify and Request for a Taint Hearing (the "Motion").   In the Motion, defendant seeks to suppress emails obtained from a search warrant signed by Magistrate Judge Lisette Reid for the email accounts of the defendant and his assistant.   The defendant contends that the warrant lacked probable cause, was overbroad and was executed in an unconstitutional manner.   For the reasons discussed herein, each of these contentions is without merit.

Separately, the defendant moves either to dismiss the indictment, suppress all evidence from the warrant, or disqualify the prosecution team because the results of the search warrant purportedly included communications between the defendant and counsel Stephen Binhak for a small portion of the period covered by the warrant.   After the defendant informed the government of this issue in May 2022 (six months after receiving the email search warrant returns in discovery), the government immediately ceased any further review of the email database and arranged for a filter attorney to confer with defense counsel to cull out any privileged material.   Moreover, defendant has not alleged that the government reviewed or used any privileged material such that

defendant has suffered prejudice.   This portion of the Motion should also be denied.

**Relevant Factual Background**

A.      *The Search Warrant*

On January 30, 2020, United States Magistrate Judge Lisette Reid in the Southern District of Florida signed a search warrant (the "warrant") for the contents of the defendant's email account – wakilfrigi@gmail.com -- hosted by Google (the "Defendant's Email Account") as well the contents of four other email accounts hosted by Google that did not belong to the defendant.   One of those other email accounts belonged to the defendant's assistant (the "Assistant's Email Account").

The warrant was supported by an affidavit signed by Internal Revenue Service Criminal Division Special Agent Patricia Gonzalez (the "Gonzalez Affidavit") (DE 63 Ex. 1).   The Gonzalez Affidavit identified the agent as having nearly ten years of experience investigating financial crimes, including money laundering, and having executed prior email search warrants. The warrant went on to describe the probable cause to support the request for seizure of the email accounts.

The Gonzalez Affidavit described the defendant as a Venezuelan citizen who became a permanent resident in the United States in or around 2012.   (Id. at ¶ 6).   The affidavit described various Panamanian companies controlled by the defendant that obtained contracts from the Venezuelan state-owned food company Corporacion de Abastecimiento y Servicios Agricola ("CASA").   (Id. at ¶¶ 7-8).   The affidavit further described various U.S. companies controlled by the defendant that obtained contracts from Petropiar and other subsidiary entities of Venezeula's state-owned oil company Petróleos de Venezuela, S.A. ("PDVSA").   (Id. at ¶¶ 9-10).   Finally, the affidavit stated that there was evidence of defendant's involvement in bribes and kickbacks

2

paid to officials at CASA and PDVSA in connection with contracts received by the defendant's

companies.   (<u>Id</u>. at ¶ 12).   Further, the affidavit stated that the defendant laundered proceeds of

those corruptly obtained contracts into bank accounts in South Florida or into real estate purchases

in South Florida.   (<u>Id</u>. at ¶ 12).

     1.    *The Probable Cause that Defendant Laundered the Proceeds of Corruption*
          *from CASA Contracts*

The Gonzalez Affidavit detailed the following evidence that the defendant had paid bribes

and kickbacks to officials at CASA for contracts going back at least as early to 2008 and then

laundered the proceeds into South Florida from 2011 through 2017.

     a.    *Defendant's Bribes to CASA Presidents from 2008 to 2010*

- Cooperating Witness 2 ("CW2") described bank accounts opened for the defendant's companies at Investors Trust Assurance ("ITA") in Cayman Islands (<u>Id</u>. at ¶ 15).   CW2 also described accounts created at ITA for two different heads of CASA. (<u>Id</u>.).

- The United States obtained records from ITA in the Cayman Islands.   (<u>Id</u>. at ¶ 16). These records show payments of over $6 million from Wakil into an ITA account for the benefit of one CASA president from 2008 to 2010.   (<u>Id</u>.)   Similarly, the records show a payment of $700,000 from Wakil to a company for the benefit of another CASA president in 2010.   (<u>Id</u>.).

- Cooperating Witness 3 ("CW3") was a former president of CASA who described meeting the defendant in an office building in Caracas in mid-2010 where the defendant explained that he had certain contracts with CASA and did not want those contracts canceled.   (<u>Id</u>. at ¶ 17.).   Ultimately, as CW3 explained, the defendant made payments for CW3 totaling over $1 million so that CW3 would maintain these contracts.   (<u>Id</u>.)

     b.    *Defendant's Bribes to the Casa President from 2011 through 2014*

- CW2 explained that he/she understood that the defendant would pay bribes for the benefit of a high-ranking CASA official from 2012-2014 in connection with CASA contracts.   (Id. at ¶ 20).

- CW2 described bank accounts opened for the defendant's companies at Compagnie Bancaire Helvetique ("CBH") in Switzerland.   (Id. at ¶ 18).   The United States obtained correspondent bank records showing transfers from CASA to the

defendant's companies at CBH of nearly $200 million from 2012 to 2014.   (Id. at ¶ 18).

- CW2 indicated that the high-ranking CASA official's brother-in-law also had an account at CBH in the name of Viltas, S.A. ("Viltas"), a Panamanian-registered company with no Internet presence.   (Id. at ¶ 20).   The United States obtained records of transfers of over $6 million from the defendant's companies in Switzerland to Viltas from 2011 to 2013.   (Id. at ¶ 21).   The United States also obtained invoices supporting that Viltas transfers that appeared suspicious on their face with large, round-dollar increments and generalized descriptions.   (Id.).

> c.      *Defendant's Laundering of CASA Proceeds to the United States*

- The United States obtained records showing numerous transfers from the defendant's accounts in Switzerland to the United States, including several different transfers identified in the affidavit, including a (a) an approximately $500,000 transfer to a real estate lawyer in Miami in December 2011, (b) approximately $9.4 million in transfers to a Citibank account in the defendant's name from March to June 2014; (c) approximately $6.8 million in transfers in transfers to a Citibank account in the defendant's name from October 2015 through January 2016; and (d) approximately $13 million in transfers to an account at Morgan Stanley from July 2016 through November 2016.   Further, the defendant acquired more than a dozen properties in South Florida and North Carolina from 2011 through 2017 using the funds from Switzerland.   (Id. at ¶¶ 22-23).

> 2.      *The Probable Cause that Defendant Laundered the Proceeds of Corruption from PDVSA Contracts*

The Gonzalez Affidavit detailed the following evidence that supported that the defendant had paid bribes and kickbacks to officials at PDVSA for contracts going back at least as early to 2012 and then laundered funds related to those corrupt contracts into South Florida.

- Cooperating Witness 4 ("CW4") was a Petropiar contractor who met the defendant in Brickell in 2015.   (Id. at ¶ 24).   CW4 said that the defendant explained that he had pipes that he could supply to PDVSA, and specifically to Petropiar.   (Id.) CW4 stated that the defendant knew that they there would have to make bribe payments to Petropiar officials to obtain a contract, including, among others, the general manager and head procurement officer of Petropiar.   (Id. at ¶ 25). CW4 explained that the defendant spoke on the phone directly with the procurement officer of Petropiar relating to the bribe.   (Id.)

- CW4 provided a copy of a pipe contract with Petropiar for approximately $11.2 million.   CW4 explained that the defendant and CW4 would split the proceeds. (Id. at ¶ 26).   CW4 said that the pipes actually cost around $1.3 million leaving a

profit split of almost $10 million between the defendant's group and CW4's group. (Id.). Bank records show that Petropiar transferred approximately $11.2 million to an account in Miami. (Id.). These records show further that the funds were transferred to Panama and then back to an account controlled by the defendant in the United States in 2016. (Id. at ¶ 29). Financial records show subsequent transfers for the benefit of the defendant, including payments to the defendant, the defendant's real estate company, and the defendant's private jet. (Id.).

- Cooperating Witness 5 ("CW5") explained that the defendant obtained inflated contracts with PDVSA through bribes. (Id. at ¶ 30). Further, CW5 provided a copy of a spreadsheet with a ledger of payments for the defendant's company obtained from the defendant's office in Miami. (Id.). The spreadsheet showed inflows of from PDVSA and affiliated entities to defendant's company from 2012 through 2017 and outflows that including bribe payments for the benefit of various officials at Petropiar and other PDVSA entities. (Id.).

### 3. The Probable Cause that the Defendant and his Assistants' Email Accounts Contained Evidence of Corruption and Money Laundering

The Gonzalez Affidavit detailed the following evidence that the defendant's email account had been used in furtherance of the corruption and money laundering scheme.

- According to CW5 (a former associate of the defendant), Wakil used the Wakil Email Account to conduct business activity related to the corrupt CASA and PDVSA contracts. (Id. at ¶ 46).

- On or about March 6, 2015, the Wakil Email Account received an email from an employee of one of the defendant's companies including a copy of two invoices from the defendant's company for PDVSA for 576 oil drums. (Id. at ¶ 47)

- Additionally, the defendant listed the Wakil Email Account on the account opening documents for accounts for his own name and in the names of certain of his businesses at CBH Bank in Switzerland. (Id. at ¶ 48).

The Gonzalez Affidavit detailed the following evidence that the defendant's assistant's account had been used in furtherance of the corruption and money laundering scheme:

- According to CW5 (a former associate of the defendant), Wakil used the Assistant's Email Account to conduct activities related to each aspect of the scheme, involving corrupt food contracts and the corrupt oil goods contracts. (Id. at ¶ 36).

- On or about July 1, 2013, the Assistant's Email Account received an email attaching a copy of an agreement between PDVSA and one of Wakil's companies and asking her assistance in translating the document. (Id. at ¶ 37)

- On or about October 1, 2013, the Assistant's Email Account received an email with a proposed marketing pitch to PDVSA and a request for defendant's assistant to translate the document and send to Wakil.   (Id. at ¶ 38).

Finally, the affidavit also indicated that, based on the agent's training and experience, and based on information received from other cases, the agent was aware that conspirators involved in corruption schemes often use personal email accounts (such as Google or Microsoft) in furtherance of the scheme, including to communicate with co-conspirators, bank officers, and corrupt government officials regarding payments.   (Id. at ¶ 49).   The agent also noted that co-conspirators often maintain ledgers and other records tracking bribe and kickback payments in these personal email accounts.   (Id.).

### 4.   The Warrant's Two-Step Execution Process

In accordance with long-standing precedent from this Circuit and elsewhere, the warrant set forth a two-step process for execution.[1]   In the first step, the warrant required Google in section 1 of Attachment B to "disclose the contents of all emails associated" with the Defendant's Email Account.   (Id. at p. 18).   In the second step, the warrant detailed in section 2 of Attachment B titled "[i]nformation to be seized by the government" the specific and particular information that the government could seize once it received the information disclosed by Google.   Specifically, the warrant authorized the seizure of information constituting "fruits, contraband evidence and instrumentalities of violations of 18 U.S.C. § 371, 1956 and 1957 (conspiracy and money laundering), and 15 U.S.C. § 78dd-1, et. seq (the "Foreign Corrupt Practices Act").   (Id. at p. 19-20).   The warrant further stated that it was limited to these violations involving the defendant

---

[1]   This two-step warrant has been consistently approved by other magistrate judges within this district besides Magistrate Judge Reid.   For example, in this case, the United States also obtained other search warrants for email accounts of the defendant's co-conspirators that included a two-step execution process.   See, e.g., 20-MJ-382-AOR, 22-MJ-20414-AOR.   The defendant has not challenged these search warrants.

and others occurring from January 2008 through the present including information pertaining to the following matters:

- Payments, offers of payments, or the promise of payments, or the giving or offering, or promising of anything of value, directly or indirectly, to any Venezuelan governmental entities (including state-owned enterprises) or individuals or businesses associated with any government agencies, or any relatives, friends or personal assistants of such officials;

- Contracts, invoices, communications, or any other documents relating to Petróleos de Venezuela, S.A. ("PDVSA"), or any of its subsidiaries, including but not limited to Petropiar S.A.;

- Contracts, invoices, communications, or any other document relating to Corporacion de Abastecimiento y Servicios Agricola Inc. ("CASA") or any of its subsidiaries or related entities;

- Contracts, invoices, communications, or any other documents relating to Wakil-related entities, including Atlas Systems International, Inc., Doux Frangosul Agro Avicola Industrial, S.A., J.A. Comercio de Generos Alimenticios e Servicios Ltd., Michi Foods, S.A., Obelisk Services, S.A. and Conference Inc, or any related or connected individuals or entities.

- Financial records and communications with bank officers, other financial officers, or accountants relating to Naman Wakil or any individual or entity related or connected to this individual or his companies.

- Real estate purchases by Naman Wakil or any individual or entity related or connected to this individual or his companies.

- Incorporation documents for any of Wakil's companies or any foreign entity connected, associated, or receiving money from any of Wakil's companies.

(Id. at p. 20-21).

### B.    *The Attorney-Client Privilege Issue*

On November 10, 2021, the United States filed its response to the Standing Discovery Order.  (DE 43).  In that response, the United States included an index of all discovery being produced to the defendant.  (Id.)  On the first page of the index, the United States listed "search warrant returns" for, among other accounts, the Defendant's Email Account, and the Assistant's

Email Account.   (Id. at 5).   The United States provided these search warrant returns in the discovery produced to the defendant.

Approximately six months after the production, on May 12, 2022, counsel for the defendant contacted the United States and, for the first time provided notice, that "[w]hile reviewing the Wakil discovery in Relativity today, we came upon emails where the sender or recipient was" counsel for the defendant.   Counsel requested that the government stop further review of the database of emails.   On the following day, the United States advised defense counsel that a DOJ filter attorney (uninvolved in the case) would be assigned to coordinate the segregation and removal of any privileged emails and that the government would not review emails in the email database.

## I.   The Defendant's Motion Should be Dismissed for Lack of Standing with Respect to the Assistant's Email Account

A defendant's Fourth Amendment Rights are violated only when the challenged conduct invades his legitimate expectation of privacy rather than of a third party.   United States v. Payner, 447 U.S. 727, 732 (1980).   A defendant seeking to suppress evidence based on an alleged Fourth Amendment violation must have a "legitimate expectation of privacy" in the particular area searched or the items seized.   Rakas v. Illinois, 439 U.S. 128, 142-43 (1978).   The defendant bears the burden of showing that he "maintains a legitimate expectation of privacy in the object of the search."   United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989); United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).

The Defendant lacks standing to challenge the search warrant as to the Assistant's Email Account.   As stated in the Gonzalez Affidavit, this email address belongs to an assistant of Wakil. Defendant nowhere alleges he owns this account.   Absent any showing that the email accounts belong to the defendant, he lacks standing to challenge the warrant on Fourth Amendment.   See,

e.g., United States v. Mathieu, 19-CR-763, 2018 WL 5869642, *2 (S.D.N.Y. Nov. 11, 2018) (denying defendant's Fourth Amendment challenge to search warrant for email accounts not belonging to defendant for lack of standing); see also United States v. Nazemzadeh, 11-CR-5726, 2013 WL 544054, at *2 n.2 (S.D. Cal. Feb. 12, 2013) (denying defendant's challenge to search of co-conspirator's email accounts "[b]ecause [d]efendant could have no reasonable expectation of privacy in the email accounts of others").

## II.     The Defendant's Challenge to the Magistrate Judge's Finding of Probable Cause Should Be Denied

Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a "fair probability" of finding contraband or evidence at a particular location.   United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).   The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched."   United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).   "The task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue a warrant."   Massachusetts v. Upton, 466 U.S. 727, 728 (1984).   Finally, courts are not to "interpret supporting affidavits in a hypertechnical manner, rather a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the highest level of deference traditionally given to magistrates in their probable cause determinations."   United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994).

Once a search warrant has issued, the issuing judge's "determination of probable cause should be paid great deference by reviewing courts."   Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995).   "So long as the magistrate had

a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Id. at 236.  The evidence contained in the Gonzalez Affidavit plainly supported the conclusion that evidence relating to the corruption and money laundering scheme at issue would be found in the Defendant's Email Account and the Assistant's Email Account.  The affiant was an experienced IRS criminal investigator with over ten years of experience.  The affiant laid out evidence in the form of witness testimony, bank records, documents, and bribe ledgers supporting the defendant's role in a scheme to launder the proceeds of contracts from bribes paid to CASA and PDVSA officials.

With respect to laundering proceeds of contracts from bribes paid to CASA officials, the affiant described:  (a) witness testimony from a former high-ranking official of CASA that the defendant paid bribes to this official in connection with CASA contracts; (b) bank account records showing millions of dollars in payments from defendant's accounts in the Cayman Islands to accounts two former presidents of CASA in the Cayman Islands form 2008 to 2010; (c) bank account records showing receipt of nearly $200 million received by defendant's companies in Switzerland from CASA between 2012 and 2014; (d) bank account records showing transfers of several million dollars from defendant's companies in Switzerland to an account controlled by the brother-in-law of a high-ranking CASA official from 2011 to 2014, along with suspicious round-dollar invoices supporting these transfers; and (e) tens of million dollars in payments from the defendant's accounts in Switzerland to the defendant's accounts in the United States and the subsequent use of those funds to buy real estate in South Florida and elsewhere from 2011 through 2017.

With respect to laundering proceeds of contracts from bribes paid to PDVSA officials, the affiant described: (a) witness testimony that the defendant obtained a substantially inflated contract

from Petropiar where the defendant had spoken on the phone with a Petropiar procurement official regarding bribes on this contract; (b) bank account records showing that funds from Petropiar went to accounts in Miami and then to the defendant's accounts after transiting through an account in Panama; (c) bank account records showing that the defendant transferred these funds to the defendant's real estate company and for expenses associated with his private jet; and (d) ledgers from the defendant's office in Miami showing inflow of funds to one of defendant's companies that included inflows from PDVSA and outflows showing bribe payments to various officials at the PDVSA entities from 2012 to 2017.

Further, the affiant described how the email account was linked to the defendant and how there was evidence that this account had been used to receive emails connected to the scheme. The affiant provided an example of an email received on the Defendant's Email Account related to a contract between one of the defendant's companies and one of the PDVSA entities in 2015 and two emails for the Assistant's Email Accounts between one of the defendant's companies and one of the PDVSA entities.   Finally, it noted that the defendant provided this email for his personal account and certain of his company accounts in Switzerland.   Such evidence plainly established more than a fair probability that the Defendant's Email Account and the Assistant's Email Account would contain evidence of the underlying crimes of money laundering and corruption.   See, e.g., United States v. Patel, 12-CR-306, 2013 WL 5819748, at *5 (E.D. Ca. Oct. 29, 2013) (finding "more than a fair probability" sufficient to support search warrant for defendant's email account in fraud scheme based on one hard copy email found in a premises search warrant); United States v. Rhame, 16-CR-67, 2016 WL 11164144, at *9 (N.D. Ga. Dec. 6, 2016) (finding more than "fair probability" sufficient to support search warrant for defendant's email account in fraud and money laundering scheme based on links "between the email account . . . and the financial institution and

11

accounts used by [co-conspirator] to conduct business and transfer proceeds").

### III.  The Defendant's Challenge to the Search Warrant as Overbroad Should Be Denied

Defendant alleges that the search warrant was overbroad with respect to the items authorized to be seized in the search warrant.  Defendant challenges the "two step" warrant at issue, by which the email providers were commanded to produce the entire contents of the account to the government.  Defendant argues that the restrictions applied by the government in reviewing these accounts are insufficient because the government could rummage through the entire accounts.

However, by their very nature, a two-step approach is how warrants have traditionally worked.  For example, a residence search warrant for specific documents would necessarily involve searching an entire premises for the ultimate seizure of a more limited volume of documents.  In such a traditional search, the government would visit the residence and make a general and brief perusal of all documents to identify relevant documents.  See, e.g. Andresen v. Maryland, 427 U.S. 463, 482 n. 11 (1976) ("In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized").  Similarly, in the context of electronic media, such as a computer or hard drive, courts have recognized the need to seize and copy the entire media for searching at a separate location.  See, e.g., Federal Rule of Criminal Procedure 41(e)(2)(B) (authorizing the seizure of electronic storage media or seizure and copying of electronically stored media for later searching).  In other words, courts have long recognized the practical need for law enforcement to exercise dominion over documents not within the scope of the warrant to identify relevant documents that fall within the warrant.

With respect to email accounts, the only apparent Eleventh Circuit case on point—United

States v. Blake, 868 F.3d 960 (11th Cir. 2017)—upheld a search warrant that appears to have used a two-step approach.   In Blake, the defendant moved to suppress a Microsoft warrant relating to two email accounts.   (Ex. 1) (Search Warrant).   According to the government's appellate brief, the United States used a "two-step approach" where the "provider first disclose[d] to the government the expanse of electronic data regarding the . . . email account, and then the government review[ed] the data to determine what falls within the categories of evidence to be seized as outlined in Attachment B."   (Ex. 2) (Government's Appellate Brief in United States v. Blake).   The Eleventh Circuit approved the Microsoft warrant finding the warrant "okay" and in "compli[ance] with the particularity requirements." 868 F.3d 960, 973.[2]

District courts in this Circuit—both pre- and post-Blake—have consistently affirmed the two-step approach of obtaining the entire contents of an email account to later determine which emails may be seized under the search warrant.   See, e.g., United States v. Montgomery, 20-CR-32, 2022 WL 3582814, at *4-5 (M.D. Ga. Aug. 19, 2022); United States v. Chrisley, 19-CR-297, 2022 WL 225621, at *3 (N.D. Ga. Jan. 26, 2022) (adopting R&R affirming two-step warrant): United States v. Soviravong, 19-146-CMS, 2019 WL 7906186, at *6 (N.D. Ga. Dec. 2, 2019); United States v. Sealed Search Warrant, 17-CR-103, 2017 WL 3396441, at *2-3 (N.D. Ala. Aug. 8, 2017); United States v. Lee 14-Cr-227, 2015 WL 5667102, at *3 (N.D. Ga. Sept. 25, 2015).[3]

---

[2]      Defendant contends that Microsoft searched the emails and "separated responsive from non-responsive emails."   (Motion at 63).   But nothing in the Blake warrant (Ex. 1) or the Blake opinion explicitly states that.   Moreover, the government's appellate brief in Blake (Ex. 2) indicates that the Microsoft did not search the material.   (Ex. 2 at 21-22) (describing two-step method used for the email account search warrant and noting the impracticalities of email service provider conducting relevance search).   Indeed, upon a review of cases around the country, the government is unaware of a single case where the service provider conducted the relevance search for emails, likely for the reasons described herein on page 15.

[3]      Defendant cites to a handful of cases from this Circuit in support of its challenge to the two-step warrant process in connection with email accounts.   United States v. Mercery, 21-CR-9, 2022 WL 585144 (M.D. Ga. Feb. 25, 2022); United States v. Matter of Search of Info Associated with Fifteen

The approach of courts in this circuit is consistent with precedent from across the country that has near overwhelmingly approved the two-step search warrant process for email accounts. See e.g., In the Matter of a Warrant for all Content and Other Information Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc., 33 F. Supp. 3d 386, 394 (S.D.N.Y. 2014) (citing cases from around the county and noting that "every case of which we are aware that has entertained a suppression motion relating to the search of an email account has upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant."); United States v. DeLeon, 21-CR-8, 2021 WL 5203222, at *5 (E.D. Ky. Aug. 23, 2021); In re Search of Records, Information and Data Associated with 14 Email Addresses Controlled by Google, LLC, 438 F. Supp. 3d 771, 778-79 (E.D. Mi. 2020); United States v. Kanodia, 15-CR-10131, 2016 WL

---

Email Addresses, 17-CR-3152, 2017 WL 4322826 (M.D. Ala. Sept. 28, 2017); United States v. Beck, 19-CR-184, 2020 WL 6112187 (N.D. Ga. Oct. 16, 2020).   Each of these is inapplicable to the present warrant.

The Mercery case is inapplicable as it relates to a search warrant for an Instagram account, and the analysis of a social media account is different from an email account because such an account is far more personal and comprehensive, including pictures, messages, and other data.   2022 WL 585144, at *5.   The Fifteen Email Addresses case is inapplicable as the court upheld the two-step seizure and search process for six email accounts, but requested a narrowing of the date limitation for the remaining email accounts. 2017 WL 4322826, at *8.   The Beck case is similarly inapplicable as it rejected a proposed two-step search warrant where it did not include a date limitation period but accepted a second warrant with such a limitation. 2020 WL 6112187, at *4-5.

The other out-of-circuit cases cited by the defendant do not suggest a blanket prohibition on two-step search warrants for email accounts, but rather indicate the necessity for date restrictions on the search.   See, e.g., In re Search of Google Email Accounts Identified In Attachment A, 92 F. Supp. 3d 944, 954 (D. Alaska 2015) (denying two-step search warrant, but authorizing the government to reapply for the a two-step warrant with narrower date limitations or other conditions); In re [Redacted]@gmail.com, 62 F. Supp. 3d 1100, 1104 (N.D. Cal. 2014) (denying two-step search warrant for email account where government lacked date restriction of any kind); Matter of Search of Info Associated with Four Redacted Gmail Accounts, 371 F. Supp. 3d 843, 845 (D. Or. 2018) (same).

3166370, at *6-7 (D. Mass. June 16, 2016);   United States v. Harder, 15-CR-1, 2016 WL 7647635

, at *3-4 (E.D. Pa. Apr. 18, 2016); United States v. Bach, 310 F.3d 1063, 1065-68 (8th Cir. 2002);

but see United States v. Mulder, 20-CR-232, 2022 WL 3644893, at *5-6 (D. Minn. Aug. 24, 2022)

(overruling Magistrate Judge's Report & Recommendation approving two-step search warrant as

overbroad, but upholding admissibility of search warrant evidence under good faith exception).

In the Motion, defendant cites proposed alternative approaches that the government should

have employed instead of the two-step approach, including requiring the service provider to search

the emails (Motion at 19) or using proposed keyword searches (Id. at 24).   As explained below,

these proposed alternatives are impractical or otherwise deficient.

First, it would be impracticable to have providers sift through the electronic information to

provide the requested materials for seizure outlined in warrants.   Not just because it would impose

a substantial burden on the service provider.   But the service provider would not be as familiar

with what materials are inculpatory or exculpatory.   See, e.g., Matter of Search of Info Associated

with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc., 13 F. Supp. 3d

157, 165 (D.D.C. 2014) ("Enlisting a service provider to execute the search warrant could also

present nettlesome problems…it would be unworkable and impractical to order Apple to cull the

e-mails and related records in order to find evidence that is relevant to the government's

investigation.").   In short, the "Fourth Amendment does not require the government to delegate a

prescreening function to the Internet service provider or to ascertain which e-mails are relevant

before copies are obtained from the internet service provider for subsequent searching."   United

States v. Taylor, 764 F. Supp. 2d 230, 237 (D. Me. 2011)

Second, the proposal to limit searches to keyword searches would also be deficient as

criminals frequently use coded words, evasive languages, non-searchable images, or alternative

email addresses with false names.   Similarly, the government may not know what search terms to apply to identify exculpatory evidence.   For this and other reasons, federal courts have rejected agreements to limit searches of electronic evidence to keyword searches.   United States v. Crespo-Rios, 645 F.3d 37, 43 (1st Cir. 2011) (in review of search warrant, "noting that government agents cannot simply search certain folders or types of files for keywords"); United States v. Adjani, 452 F.3d 1140, 1150 (9th Cir. 2006) (holding that restricting computer search to specific search terms "would likely have failed to cast a sufficiently wide net to capture the evidence sought").

The defendant's concern about a "general rummaging" in the Defendant's Email Account is tempered by the limitations inherent in the search warrant (date restrictions and content restrictions).   Specifically, the government will only be able to introduce and use evidence that meets the specific limitations set forth in the warrant.   Accordingly, agents or prosecutors would have little incentive to conduct a general rummaging for materials outside the limitations of the search warrant because such materials would not be admissible in court.

## IV.   The Defendant's Motion to Suppress the Search Warrant Evidence Should Also Be Denied Because the Government Acted in Good Faith

Even if the warrant was deemed invalid under the Fourth Amendment, the evidence should not be suppressed because of the good-faith exception to the exclusionary rule.   This exception provides that evidence obtained pursuant to a warrant later determined to be invalid under the Fourth Amendment is admissible if the executing officer's reliance on the issued warrant, and belief that the warrant was valid, were reasonable.   United States v. Leon, 468 U.S. 897, 921-24 (1984); United States v. Morales, 987 F.3d 966, 974 (11th Cir. 2021).   The good faith exception does not apply if (1) the judge was misled by information in an affidavit that the affiant knew or would have known was false; (2) the magistrate wholly abandoned their judicial role; (3) the affidavit is so lacking in indicia or probable cause as to render an officer's belief entirely

unreasonable or (4) the warrant is so facially deficient that an executing officer cannot reasonably presume it to be valid.   United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002).

In this case, the government's search warrant meets the provisions of the good-faith exception.   Here, the agent would have considered it reasonable to accept the results of the warrant given that similar warrants have routinely been approved by courts in this district and elsewhere. There is no allegation that the judge was misled by false statements or abandoned her judicial role. Moreover, the affidavit was certainly not so lacking in probable cause that the officer's reliance on them would have been deficient.   Finally, the warrant is not so facially deficient as to be presumed invalid given that courts throughout the country routinely have upheld identical warrants.   Therefore, the good-faith exception and the evidence seized from the warrant should not be suppressed.   Montgomery, 2022 WL 3582814, at *5, n.2 (in response to defendant's motion to suppress search warrant as overbroad and lacking probable cause, finding that even if warrant had these defects, good faith exception to exclusionary rule applies to prevent suppression).

## V.   The Defendant's Request for Dismissal, Suppression of All Evidence, Or Disqualification Should Be Denied

Defendant seeks dismissal of the indictment, suppression of the evidence, or disqualification of the prosecution based on the government's alleged access to privileged documents in the email accounts.   In May 2022, approximately six months after receiving discovery, defense counsel contacted the prosecution team to advise for the first time that it identified potentially privileged material involving counsel Stephen Binhak on that date.   Upon receiving this information, the government put in place a filter attorney at DOJ to coordinate with defense counsel to remove any material identified by the defense as privileged and closed access

to the database of emails pending completion of that process.[4]

Defendant contends that the government should have been aware of potential taint issues for the period from April 2019 through February 2020 and that the government had access to emails with defense counsel.  As the defendant notes, there are over 100,000 documents in the combined email accounts from January 2008 to February 2020.   As such, the government did not review every document from the warrant.   Rather, the government focused its review of documents primarily on the period set forth the indictment from approximately 2010 to 2017 in which the defendant engaged in the bribery of Venezuelan officials and laundering of funds from the bribery schemes.   For the period of the purported taint (April 2019 to February 2020), the government searched these records with search terms to identify bank accounts to trace the defendant's laundering of proceeds through his bank accounts in Switzerland.   The government does not believe that this resulted in the review of privileged materials and is not aware of any privileged material used in its investigation and prosecution of the defendant.

### A.   *Dismissal of the Indictment Is Not an Appropriate Remedy*

The remedy of dismissal of the indictment is not appropriate in this matter.  To obtain dismissal of an indictment based on alleged intrusion into the attorney-client relationship, the defendant must establish that government misconduct caused prejudice to the defendant.  See United States v. Ofshe, 817 F.2d 1508, 1515 (11th Cir. 1987).   A district judge may "impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations" and "only if [prosecutorial] misconduct actually prejudiced the defendant."   United States v.

---

[4]   In or around late May 2022, the DOJ filter attorney was put in place and began communications with counsel outside of the presence of the prosecution team.   The defense team requested that the DOJ filter team not review the privileged emails and instead await a list of privileged emails identified for removal.   Based on a recent conversation, the DOJ filter attorney advised the undersigned that the defense team has not identified or provided a list of privileged documents for culling purposes.

Campagnulo, 592 F.2d 852, 865 (5th Cir. 1979); see also Bank of Nova Scotia v. United States, 487 U.S. 250, 255 (1988) (a "district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant.").

Even where the requirements of prosecutorial misconduct and prejudice are met, courts often choose a lesser remedy short of dismissal, such as to suppress the privileged evidence.   See United States v. Morrison, 449 U.S. 361, 365 (1981) ("Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial"); United States v. Melvin, 650 F.2d 641, 644 (5th Cir. 1981) (remanding the case for further findings on question and, if prejudice was found, for "some remedy short of dismissal").

In this case, the defendant has not met the burden to establish the "extreme" sanction of dismissal in this case.   The defendant has not identified any purportedly privileged document that the government reviewed, let alone any such documents were used or relied upon by the government in its investigation.

### B.      Blanket Suppression of All Emails is not an Appropriate Remedy

The remedy of blanket suppression of emails also is not an appropriate remedy. Courts generally do not suppress all items in a warrant absent evidence that those executing a warrant acted in a "flagrant disregard" of the warrant's terms.   See, e.g., United States v. Wuagneux, 683 F.2d 1343, 1354 (11th Cir. 1982).    Here, there was no such "flagrant disregard" to merit such relief.   There was nothing in the government's review protocol that ran afoul of the language in the warrant.

Moreover, the manner of government's execution does not merit suppression of all emails. The case of Patel is instructive and contains similar facts.   United States v. Patel, 16-798, 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017).   In that case, the government obtained a search warrant

for emails of the defendant from the period from October 2012 to June 2016.   Defendant filed a motion seeking to suppress all emails because a portion of the emails obtained (April 2016 to June 2016) included emails from when the government knew the defendant had counsel.   As in this case, after the warrant, the government received notice from the defendant that the email account contained privileged materials.   Again, as in this case, the government set up a taint team where an unaffiliated DOJ attorney conferred with defense counsel to filter out any privileged items from further use.   The Court found that "such remedial steps do not evidence the sort of bad faith or flagrant disregard to justify prohibiting the government from using the [search warrant] evidence at trial."   Patel, 2017 WL 3394607 at *6-7; see also Harder, 2016 WL 7647635, at *6 ("Assuming, arguendo, the Government viewed even a few privileged communications, this de minimis intrusion does not warrant the wholesale suppression" of all emails from a search warrant).

Of course—to the extent they exist in the production—the government acknowledges that it may not use privileged material.   As noted above, the government has arranged with defense counsel so that they can cull out any such privileged material so that it is no longer available to the government.   Accordingly, the proper remedy here is to suppress any material that may be privileged, and the parties are working toward that objective.   See, e.g., United States v. Sander, 615 F.2d 215, 219 (5th Cir. 1980) (noting that proper remedy for intrusion on attorney-client privilege is suppression of privileged material).

### C.  Prosecution Team Disqualification Is Not an Appropriate Remedy

The remedy of disqualification is also not appropriate.   Like dismissal, the defendant must show misconduct and prejudice by the prosecution team to seek disqualification.   United States v. Esformes, 16-CR-20549-RNS, 2018 WL 5919517, at *3 (S.D. Fla. Nov. 13, 2018); United States v. Kachkar, 16-CR-20595-DPG, 2018 WL 6974949, at *3 (S.D. Fla. Dec. 26, 2018).   The defendant bears the burden of establishing the misconduct and prejudice.   Kachkar, 2018 WL

6974949, at *3.

The defendant has not met its burden of showing misconduct and prejudice to merit disqualification of the prosecution team.   In the Motion, defendant has not identified privileged material used by the government in its case.   The government does not anticipate introducing documents from the Defendant's Email Account from the alleged taint period.   Accordingly, defendant's request for disqualification lacks merit and should be denied.   See, e.g., Kachkar, 2018 WL 6974949 (denying request for disqualification given defendant's vague claim of alleged prejudice and government's representation that it would not introduce any of alleged privileged material at trial); United States v. Walker, 243 F. App'x 621, 622-24 (2d Cir. 2007) (upholding the district court's denial of a motion to disqualify, reasoning that there was no egregious misconduct on the part of prosecutors based on limited, inadvertent exposure to privileged documents, none of which were used at trial);   United States v. Stewart, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (denying pretrial motion to disqualify the prosecutor for inadvertent review of a privileged email, where the motion was only supported by "vague and conclusory allegations of the harm").   As in those cases, so too here.[5]

---

[5]     The case cited by the defendant involving disqualification is inapplicable to the instant matter as that case, unlike this one, involved a deliberate effort by the prosecution to review and use privileged material *after* being made aware of the privileged material by counsel.   See United States v. Horn, 811 F. Supp. 739, 748 (D.N.H. 1992) (disqualifying prosecutor who reviewed and used attorney work product materials *after* being put on notice by defense counsel of nature of material).

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court deny the relief requested in the Motion.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:  /s Michael N. Berger
Michael N. Berger
United States Attorney's Office
99 NE 4th Street
Miami, Florida 33133
Tel: 305-961-9445
Email: Michael.berger2@usdoj.gov

GLENN LEON
CHIEF, FRAUD SECTION
Criminal Division
U.S. Department of Justice

By:  /s/ Alexander Kramer
Alexander Kramer
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
Court ID No. A5502240
1400 New York Ave. NW
Washington, DC 20005
Tel: (202) 768-1919
Email: Alexander.kramer@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on September 19, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF thereby serving on counsel of record.

<u>/s Michael N. Berger</u>
Michael N. Berger
Assistant United States Attorney