UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CR-20406-WILLIAMS/REID

UNITED STATES OF AMERICA,

v.

NAMAN WAKIL,

    Defendant.
_____/

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO DISMISS INDICTMENT**

This cause is before the Court on Defendant, Naman Wakil's ("Wakil") Motion to Dismiss Indictment (the "Motion"). [ECF No. 64]. The Government filed its Response on September 19, 2022, [ECF No. 76], and Wakil filed his Reply on October 17, 2022 [ECF No. 83]. The Motion was referred to the Undersigned by the Honorable Kathleen M. Williams for a Report and Recommendation. [ECF No. 87]. For the reasons stated below it is **RECOMMENDED** that the Motion [ECF No. 64] be **DENIED**.

**BACKGROUND AND RELEVANT PROCEDURAL HISTORY**

This is a Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* (the "FCPA") case. The Indictment revolves around Wakil's actions between approximately 2010 through 2017, in which he allegedly bribed a number of different Venezuelan government officials, with the assistance of co-conspirators, to obtain and further his business interests in that country. *See generally* [ECF No. 3].

1

I. **Procedural History**

On July 29, 2021, a federal grand jury indicted Wakil on seven felony charges including: (1) conspiracy to violate the FCPA under 18 U.S.C. § 371; (2) violating the FCPA under 15 U.S.C. § 78dd-2; (3) conspiracy to commit money laundering under 18 U.S.C. § 1956(h); (4) international laundering of monetary instruments under 18 U.S.C. § 1956(a)(2)(A); and (5) three counts of engaging in transactions in criminally derived property under 18 U.S.C. § 1957. *See* [ECF No. 3]. On August 19, 2022, Wakil filed the instant Motion to Dismiss Indictment. [ECF No. 64]. In the Motion Wakil advances three arguments: (1) that the Government insufficiently alleges the FCPA's "obtain or retain business" element; (2) the Government insufficiently alleges the FCPA's "corrupt intent" element; and (3) that some of his conduct is exempted under the FCPA's "facilitation payments" exception, which the Government failed to negate in the Indictment. *See generally* [*Id.*].

II. **Factual Background**

Wakil, a Syrian Citizen and permanent resident of the United States, owned and operated food and oil companies which conducted business in Venezuela. [*Id.* at 3–4]. Wakil opened bank accounts for the food companies in Switzerland and the Cayman Islands, and in the United States for the oil companies. [*Id.* at 2–4].

Wakil's food companies (collectively the "Wakil Food Companies") conducted business with Venezuela's state-owned and controlled food company Corporacion de Abastecimiento y Servicios Agricola ("CASA"). [*Id.* at 2]. CASA, run by Venezuela's Ministry of People's Power for Food, purchases food for the Venezuelan people. [*Id.*]. Similarly, Wakil's two oil companies (collectively the "Wakil Oil Companies") conducted business with state-owned and controlled Venezuelan oil company Petróleos de Venezuela, S.A. ("PDVSA"), as well as with PDVSA

2

subsidiaries Petropiar, S.A. ("Petropiar"), a joint venture between PDVSA and an American oil company, and Petromiranda, S.A. ("Petromiranda"), a joint venture between PDVSA and a Russian oil company. [*Id.* at 3].

### A.     Wakil's Contacts with CASA Officials

The Indictment asserts that Wakils' "corrupt" relationship with CASA officials began in 2010. [*Id.* at 7]. At some point in 2010, Wakil met with a CASA official, named in the Indictment as "Venezuelan Official 1" in an office building in Caracas, Venezuela. [*Id.*]. At this meeting "Wakil agreed to make corrupt payments to Venezuelan Official 1 to obtain and retain contracts and business advantages, including disbursements of contractual payments for the Wakil Food Companies with CASA." [*Id.*]. Between January 2010 and June 2011 Wakil received approximately $30 million from CASA which was sent through wire transfers to one of the Wakil Food Companies' bank accounts in the Cayman Islands. [*Id.*]. Between August and September 2010 Wakil transferred approximately $750,000 from this same bank account to a South Florida bank account "for the benefit of Venezuelan Official 1." [*Id.*]. Wakil hid the corrupt nature of these payments by "provid[ing] false invoices to the bank in the Cayman Islands falsely indicating that the payments were for, among other things, logistical services and customs paperwork." [*Id.*].

The Indictment alleges that in or around December 2011 or 2012, Wakil met with "Venezuelan Official 2," in Caracas, Venezuela. [*Id.* at 8]. Wakil "agreed to make corrupt payments to Venezuelan Official 2 to obtain and retain contracts and business advantages, including disbursements of contractual payments for the Wakil Food Companies with CASA." [*Id.*]. These payments were to be made through Venezuela Official 2's relative "Co-Conspirator 2." [*Id.*]. To assist in this effort Wakil instructed "Co-Conspirator 1," a Venezuelan citizen, "to set

3

up bank accounts in Switzerland for the benefit of Co-Conspirator 2 and Venezuelan Official 2." [*Id.*].

Wakil's payments to the CASA officials appear to have borne fruit. Between 2012 and 2015 CASA wired approximately $225 million to the Wakil Food Companies' Swiss bank accounts. [*Id.*]. During that time Wakil transferred approximately $11 million from the Wakil Food Companies' Swiss banks accounts "to a bank account in Switzerland controlled by Co-Conspirator 2 for the benefit of Venezuelan Official 2." [*Id.*]. As with the other "bribe payments," Wakil disguised the nature of these payments by providing the Swiss banks with false invoices stating that the payments were for logistical services and customs paperwork. [*Id.*]. Wakil also transferred at least $50 million of the CASA payments to his personal Swiss bank account, and from there $20 million to his personal Miami-based bank accounts, much of which was spent on luxury items such as apartment units, a yacht, and a private airplane. [*Id.*].

### B.   Wakil's Contacts with PDVSA and its Subsidiaries

The Indictment explains that Wakil's illicit contacts with PDVSA officials began in 2014. [*Id.* at 9]. At that time Wakil met "Venezuelan Official 3" and "Co-Conspirator 5" at Wakil's office building in Miami, Florida. [*Id.*]. At this meeting Wakil offered "to make corrupt payments" to Venezuelan Official 3 in order for the Wakil Oil Companies to "obtain or retain" lucrative contracts with Petromiranda. [*Id.*]. In aid of this bribery-scheme, Venezuelan Official 3 sent an email to "Co-Conspirator 3" seeking to coordinate Wakil's payment of a $100,000 bribe to a shell company bank account in Panama. [*Id.*]. Co-Conspirator 3 forwarded this email to Wakil, and thereafter Wakil sent the $100,000 to Venezuelan Official 3 from one of his oil companies' bank accounts. [*Id.*]. As a result, in 2015, one of Wakil's oil companies received approximately $7.7 million in connection with a Petromiranda contract. [*Id.*]. That same year, Wakil transferred

approximately $250,000 from one his oil companies to a United States corporate bank account for the benefit of Venezuelan Official 3. [*Id.*].

In 2015, Wakil also established a relationship with "Venezuelan Official 4." [*Id.*]. Wakil "caused an e-mail to be sent to Venezuelan Official 4 seeking to obtain contracts for Wakil Oil Company 2 with Petropiar." [*Id.*]. To facilitate Venezuelan Official 4's cooperation with this effort, Wakil had Co-Conspirator 1 open a Panamanian bank account in the name of a shell company for the benefit of Venezuelan Official 4. [*Id.*]. As part of this effort, Co-Conspirator 3 "received documents by e-mail from a close relative of Venezuelan Official 4, including the passport of Venezuelan Official 4, to open a bank account for a shell company in Panama." [*Id.*].

Thereafter, Wakil received his contract with Petropiar. In 2015 Venezuelan Official 4 approved a contract for Petropiar to purchase pipes from Wakil Oil Company 2. [*Id.* at 10]. Wakil then purchased pipes from China for approximately $1.3 million, and sold them to Petropiar for approximately $11.2 million. [*Id.*]. To disguise his interest in the contract, between January and July 2016, Wakil had Petropiar make payment on the contract to a Miami-based corporate account belonging to Co-Conspirator 4. [*Id.*]. Further, Wakil "did not receive transfers directly from the corporate account of Co-Conspirator 4. Instead, "[Wakil] and his co-conspirators caused multiple wire transfers from the corporate account of Co-Conspirator 4 in Miami to an account controlled by Co-Conspirator 1 in Panama … [and] thereafter caused additional wire transfers from Co-[C]onspirator 1's account in Panama to accounts of Wakil Oil Company 2 in the United States." [*Id.*].

In 2017, following Petropiar's payment on the pipe-contract, Wakil met with Venezuelan Official 4 and Co-Conspirator 5 at Wakil's "office building in Miami to discuss the bribe for Venezuelan Official 4 relating to the Petropiar pipe contract and purchase order." [*Id.*]. That same

5

year, Wakil transferred ownership of an approximately $300,000 Miami, Florida condominium to a corporate entity controlled by Venezuelan Official 4's close relative. [*Id.*].

## LEGAL STANDARD

Federal Rule of Criminal Procedure 7 provides that an indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). A defendant may challenge the sufficiency of an indictment by filing a motion to dismiss an indictment under Federal Rule of Criminal Procedure 12(b). "The sufficiency of a criminal indictment is determined from its face." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992). To pass minimal constitutional muster an indictment must: "(1) present[] the essential elements of the charged offense; (2) notif[y] the accused of the charges to be defended against; and (3) enable[] the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Dabbs*, 134 F.3d 1071, 1079 (11th Cir. 1998).

In evaluating a motion to dismiss an indictment the court must take the allegations in the indictment as true. *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987). As such, "a court may not dismiss an indictment … on a determination of facts that should have been developed at trial." *Id.* "[W]hen analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined by practical, not technical, considerations." *United States v. Poirier*, 321 F.3d 1024, 1029 (11th Cir. 2003) (internal quotation marks and citation omitted).

## DISCUSSION

In his Motion to Dismiss, Wakil raises three arguments. First, he argues "the Government has not sufficiently alleged the FCPA's required 'obtain or retain business' [or 'business nexus']

element." [ECF No. 64 at 2]. Second, Wakil avers the Indictment inadequately alleges the "corrupt intent" element. [*Id.*]. Lastly, Wakils contends that even if the government sufficiently alleged the aforementioned statutory requirements, the indictment still fails because "the FCPA's express facilitation exception exempts certain of Wakil's conduct from the FCPA, and the Government has failed to negate this exception." [*Id.*]. Each of these arguments will be addressed in turn. Additionally, Wakil's arguments, which concern certain sections of the FCPA only concern Counts 1 and 2 of the Indictment. As the Government has noted in its Response to the Motion to Dismiss the remaining counts are unchallenged here. [ECF No. 76 at 1 n.1].

### I. The Indictment Adequately Alleges the "Obtain or Retain" Business Element

The

> The FCPA prohibits payment to foreign officials for purposes of: (i) influencing any act or decision of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official; or (iii) securing any improper advantage … in order to assist [the company making payment] in obtaining or retaining business for or with, or directing business to, any person.

*United States v. Kay*, 359 F.3d 738, 743 (5th Cir. 2004) (quoting 15 U.S.C. § 78dd–1(a)(1)). The FCPA does not, however, criminalize all payments to foreign officials. *Id.* Rather, it only proscribes those payments intended to "(1) influence a foreign official to act or make a decision in his official capacity, or (2) induce such an official to perform or refrain from performing some act in violation of his duty, or (3) secure some wrongful advantage to the payor." *Id.* "[E]ven then, the FCPA criminalizes these kinds of payments only if the result they are intended to produce—their *quid pro quo*— will *assist* (or is intended to assist) the payor in efforts to get or keep some *business* for or with 'any person.'" *Id.* (emphasis in original).

Admittedly, the plain language of the FCPA is ambiguous. As the *Kay* court noted, the FCPA fails to define the phrase "obtaining or retaining business." *Id.* at 744; *see also United States*

7

*v. Kozeny*, 493 F. Supp. 2d 693, 705 (S.D.N.Y. 2007). The "failure of the language of the FCPA to give a clear indication of the exact scope of the business nexus element" creates difficulties for courts considering "how attenuated can the linkage be between the effects of that which is sought from the foreign official in consideration of a bribe … and the briber's goal of finding assistance or obtaining or retaining foreign business with or for some person, and still satisfy the business nexus element of the FCPA." *Kay*, 359 F.3d at 744. This ambiguity resulted in the *Kay* court undertaking a self-described "ad nauseum" analysis of the legislative history of the FCPA. *Id.* at 758.

Following this exhaustive analysis, the court concluded that "Congress intended for the FCPA to apply broadly to payments intended to assist the payor, either directly or indirectly, in obtaining or retaining business for some person." *Id.* at 755. The court reasoned that this broad application covered "both the kind of bribery that leads to discrete contractual arrangements and the kind that more generally helps a domestic payor obtain or retain business for some person in a foreign country." *Id.* at 755–56. The court explained that this understanding of the business nexus element was further supported by the FCPA's narrow statutory exceptions, because "by narrowly defining exceptions and affirmative defenses against a backdrop of broad applicability, Congress reaffirmed its intention for the statute to apply to payments that even indirectly assist in obtaining business or maintaining existing business operations in a foreign country." *Id.* at 756.

With the understanding of the FCPA's broad application, the parties' arguments can now be addressed. As to the "obtain or retain business" element, Wakil advances three main arguments for the insufficiency of the Indictment. First, Wakil argues that the Indictment merely tracks the statutory language and therefore does not reasonably apprise him of what conduct is charged. [ECF No. 64 at 6–7]. Second, the Indictment concerns "conduct that occurred after Wakil had actually

obtained the relevant business according to the Indictment." [ECF No. 64 at 3]. Lastly, that the Indictment concerns alleged business advantages for contracts Wakil's businesses had already obtained. [*Id.*].

As to Wakil's first argument, the Government contends the Indictment does more than merely track the statutory language, but lays out the factual basis and overt acts constituting the alleged bribery. [ECF No. 76 at 5–7]. Consequently, the Government contends the Indictment clearly apprises Wakil "of the charges against him and provide[s] enough specificity to avoid future jeopardy issues." [*Id.* at 7]. The Government's assertion is correct.

As the Government points out, the Indictment "alleges the official to whom bribes were paid, the entity from which the defendant obtained or retained business as a result of the bribe, the approximate value of the contracts obtained, and the approximate time frame the contracts and business advantages were obtained." [*Id.*]. The indictment does so by providing not only the factual background underpinning these allegations, but also a separate section in which it sets forth the specific overt acts Wakil himself took, or directed another to undertake on his behalf, to further his oil and food companies' business interests in Venezuela. *See generally* [ECF No. 3].

In his Motion to Dismiss, Wakil includes a chart with seventeen selected portions of the Indictment he contends demonstrates that the Indictment merely tracks the statutory language. [ECF No. 64 at 3–5]. This chart, however, ignores the other portions of the Indictment that provide the full picture of Wakil's alleged activities aimed at "obtaining or retaining" business from the Venezuelan government entities. These other crucial portions of the Indictment set out the "who, what, where, when, and how" of the allegations. When read as a whole they explain which Venezuelan official was the target of a bribe, which Venezuelan government entity the official worked for, what Wakil offered the official as a bribe, what Wakil's companies were to receive or

did in fact receive for such consideration, when the bribe payment was made, through which bank accounts the bribe payments were sent, which co-conspirator intermediaries were involved in facilitating the bribe payments and, of course, how the contractual payments Wakil received were disbursed. Despite Wakil's contentions to the contrary, the Government does significantly more than track the statutory language.

Wakil next argues that "when [the] 'obtain or retain business' allegations go beyond merely tracking the statutory language, the allegations concern conduct *after* Wakil's businesses 'obtained business.'" [ECF No. 64 at 7] (emphasis in original). Specifically, Wakil contends that "the only 'obtained or retained' allegation with any real detail concerns the alleged $11.2 million Petropiar pipe contract … [in which] Wakil allegedly paid this bribe to 'cause[] Venezuelan Official 4 to approve' the contract … [which the Indictment alleges] occurred approximately two years *after* Wakil allegedly 'obtained' the business." [*Id.*] (emphasis in original).

As an initial matter, it should be noted that Wakil fails to cite to a single case stating that where payment of a bribe is made after a payor had received the benefit of any bargain struck, no violation of the FCPA occurs. Nor has the Undersigned found any. Further, this argument is in tension with the FCPA's language, broad application, and the facts alleged in the Indictment. As the Government notes the FCPA "contains no provision that the actual payment of a bribe must occur prior to business being awarded … [and if Wakil's] argument were true, this would create an outsized loophole that would allow bribe payment to occur so long as the payments were delayed." [ECF No. 76 at 8]. Wakil rebuts this argument by noting that the FCPA requires any bribe payment be made for the purpose of influencing or inducing the government official to assist the payor in securing business and in his "case, Count 2 fails to satisfy this requirement because it describes a financial transaction in 2017 that could not have been made *for the purpose of*

10

influencing Venezuelan Official 4 to award a contract that had already been awarded two years before." [ECF No. 83 at 3].

Wakil further argues that while it is true the FCPA does criminalize even a "promise to pay," the Indictment falls short in this regard as well because it "contains *no* allegations that [he] made any promise to Venezuelan Official 4 in 2015." [*Id.*]. As such, Wakil reasons that the Indictment impermissibly relies on the "inference" that he made a promise to pay in 2015. [*Id.*]. Therefore, Wakil asserts the Indictment violates the Grand Jury Clause of the Fifth Amendment because the Indictment failed to allege an element of the charged offense that had to be alleged in the Indictment and considered by the grand jury. [*Id.* at 4–5].

This argument, however, falls short. The Indictment contains factual allegations detailing specific acts undertaken *in 2015* that support the conclusion that Wakil began the process of coordinating bribe payments to Venezuelan Official 4. Specifically, the Indictment notes that in 2015 (1) Wakil "caused an e-mail" to be sent to Venezuelan Official 4 seeking to obtain a contract with Petropiar; (2) that Wakil had Co-Conspirator 1 open a bank account in the name of a shell company for Venezuelan Official 4's benefit; (3) that Co-Conspirator 3 received documents via e-mail from Venezuelan Official 4's close relative to assist in setting up the Panamanian bank account; (4) thereafter Venezuelan Official 4 approved the Petropiar pipes contract; and (5) that Wakil concealed and disguised the beneficiaries of the Petropiar contract by having the payments made to Co-Conspirator 4's corporate bank account in Miami. [ECF No. 3 at 9–10]. Read in conjunction with the other allegations involving Venezuelan Official 4, these facts detail a bribery scheme that preceded the 2015 award of the Petropiar pipes contract and came to fruition with the actual bribe in 2017. Whether these facts are sufficient to support a conviction is a jury question.

Lastly, Wakil argues the remaining "obtain or retain business" allegations involving Venezuelan Officials 1, 2, and 3 are insufficient because these involve contracts he had already obtained and that the Indictment "never alleges that [his] businesses were not legally entitled to payments for already 'obtained' contracts." [ECF No. 64 at 8]. Wakil contends this "deficiency is critical because seeking disbursements of payments on contracts already 'obtained' does not violate the FCPA's 'obtain or retain business' element." [*Id.*].

This argument also fails. The Government asserts "this argument completely mischaracterizes the allegations in the indictment. In the allegations regarding payments to each of these officials, the indictment alleges the defendant met with the official and 'agreed to make corrupt payment to obtain and retain contract ***AND*** business advantages, including disbursements of contractual payments' on the obtained contracts." [ECF No. 76 at 10]. This is correct. The Indictment is replete with allegations that Wakil illegally procured or retained these contracts through bribe payments to the various CASA and PDVSA officials. *See generally* [ECF No. 3]. Wakil's argument to the contrary ignores the allegations set forth in the Indictment.

## II. The Indictment Adequately Alleges the "Corrupt Intent" Element

Wakil next argues that the Indictment insufficiently alleges the FCPA's "corrupt intent" element. As discussed below, because this argument largely parrots those made regarding the "obtain or retain business" element, it fails.

Under the FCPA "[a] person acts corruptly if he acts voluntarily and intentionally, with an improper motive of accomplishing either an unlawful result or a lawful result by some unlawful method or means. The term 'corruptly' is intended to connote that the offer, payment, and promise was intended to influence an official to misuse his official position." *United States v. Seng*, 934 F.3d 110, 142 (2d Cir. 2019) (quoting *United States v. Kozeny*, 667 F.3d 122, 135 (2d Cir. 2011)).

Regarding the FCPA's "corrupt intent" element, Wakil largely raises the same arguments he did regarding the "obtain or retain business" element. Specifically, Wakil avers that the Indictment "does not fairly apprise [him] of the charges against him, as there is not specific information" from which he can glean his supposed "corrupt" conduct. [ECF No. 64 at 10]. Additionally, he argues that that the Indictment is insufficient to satisfy the corrupt intent element because it "is silent as to how [his] alleged conduct induced Venezuelan officials to 'misuse' their official positions or intended 'wrongfully to influence' the officials as required by the FCPA[]." [*Id.*]. As Wakil previously argued, the Indictment "includes allegations concerning: (i) payments *after* Wakil's businesses 'obtained business' with certain Venezuelan entities; and (ii) conduct concerning alleged 'business advantages' including disbursements of contractual payments on contracts Wakil's businesses *already* 'obtained.'" [*Id.* at 11] (emphasis in original). Thus, Wakil reasons "the Indictment fails to describe how it is possible to make payments to induce a foreign official to provide business when the payment is made after the official has already made the decision to award the business" or for payments already owed to Wakil's businesses. [*Id.*].

But these arguments fail for the same reasons they did on the "obtain or retain business" element. As the Government accurately points out "[a]gain [Wakil] ignores the majority of the indictment and cherry-picks select allegations in an attempt to create a cognizable argument." [ECF No. 76 at 12]. As discussed at length above, Wakil's arguments that the Indictment fails to allege that Venezuelan Official 4 received payment after the contract had been awarded is without merit. Similarly, Wakil's argument that the allegations concerning Venezuelan Officials 1, 2, and 3 fail because they deal with disbursements of contractual payments already owed does not hold water. These arguments fare no better under the "corrupt intent" element.

13

Further, the Indictment contains numerous factual allegations to support the "corrupt intent" element, such as Wakil's numerous "attempts to conceal the true nature of the bribes paid to Venezuelan Officials 1, 2, 3, and 4." *See* [*Id.* at 13–14]. As such, Wakil's arguments in this regard fail.

### III. The Government Was Not Required to Expressly Negate the FCPA's Facilitation Payments Exception Nor is the Exception Applicable in the Instant Case

Lastly, Defendant argues that the Indictment fails "because the allegations fail to negate the [FCPA's] express facilitation payment exception." [ECF No. 64 at 12]. This argument fails, however, because the Government was not required to expressly negate the exception in the Indictment and the allegations concern contracts purportedly procured through bribery.

The FCPA provides as an exception to its coverage so-called "grease" or "facilitating" payments defined as "any facilitating or expediting payment to a foreign official … the purpose of which is to expedite or to service the performance of a routine governmental action by a foreign official." *Kozeny*, 493 F. Supp. 2d at 713 n. 91 (quoting 15 U.S.C. § 78dd-1(b)). The FCPA defines "routine governmental actions" as those "that are ordinarily and commonly performed by a foreign official, such as obtaining licenses, visas, police protection, mail services or inspection." *Id.* (citing 15 U.S.C. § 78dd-1(f)(3)(A)); *see also* 15 U.S.C. § 78ss-2(h)(4)(A). As the *Kay* court explained "the extent to which the exception for routine governmental action … is narrowly drawn reasonably suggests that Congress was carving out very limited categories of permissible payments from an otherwise broad statutory prohibition." *Kay*, 359 F.3d at 745. In doing so, the *Kay* court reasoned Congress was seeking to distinguish "essentially ministerial actions that merely move a particular matter toward an eventual act or decision or which do not involve any discretionary action." *Id.* at 747 (internal quotation marks and citation omitted).

As an initial matter, Wakil's argument that the Government was required to expressly negate the exception in the Indictment has little support. As the Government notes, Wakil cites to a single non-binding civil case, *SEC v. Jackson*, 908 F. Supp. 2d 834 (S.D. Tex. 2012), for this proposition. [ECF No. 64 at 13]. In *Jackson*, the district court put forth that the use of "the word 'corruptly' to except facilitating payments from the ambit of the FCPA … [strongly suggests Congress intended] that the SEC must bear the burden of negating the 'facilitating' payments exception…. [and as such] [t]he facilitating payments exception is best understood as a threshold requirement to pleading that a defendant acted 'corruptly.'" 908 F. Supp. 2d at 857. Construing such a requirement is unconvincing, however, because as with any indictment, the Government must provide a sufficient factual basis to support its allegations—including proffering allegations to support that a defendant acted "corruptly" as set out in the FCPA. Thus, a requirement that the Government be required to expressly negate the facilitating payments exception and to satisfy the constitutional requirements to bring an indictment are in essence one and the same.

Next, the allegations set forth in the Indictment do not constitute the sort of "grease" payments excepted by the FCPA. In *United States v. Duperval*, the defendant was alleged to have violated the FCPA by receiving bribes to administer international contracts with Haitian state-owned telecommunication companies. 777 F.3d 1324, 1328 (11th Cir. 2015). The defendant argued that his actions merely constituted the routine governmental action of "providing phone service as the [FCPA] uses that term." *Id.* at 1334 (internal quotation marks and citation omitted). The Eleventh Circuit disagreed. It concluded that "[t]he administration of a multi-million dollar telecommunication contract is not an 'action[] of a similar nature' to the actions enumerated in the [FCPA] … [because the defendant] was not a low-level employee who provided a routine service; he was a high-ranking official who administered international contracts." *Id.* Thus, the defendant's

15

actions could not be characterized as a "grease payment" intended to "expedite the receipt of routine service." *Id.* at 1334–35. Rather, the court noted that the FCPA exceptions the defendant was relying on refer "to the government providing a service to a person or business, not to the government administering contracts with companies that provide telephone service." *Id.* at 1335.

The situation here is quite similar to the one in *Duperval*. Wakil argues the conduct here was routine governmental actions such as "processing governmental papers" or "actions of a similar nature." [ECF No. 64 at 13]. Yet, the allegations in the Indictment describe a bribery scheme aimed at obtaining or retaining multi-million dollar oil and food contracts with Venezuelan state-owned companies. And despite Wakil's insistence that the Indictment never indicated that he was not legally entitled to payment under the contracts, the Indictment asserts the contracts were "corruptly" obtained on numerous occasions. Thus, as in *Duperval*, Wakil is attempting to characterize the multi-million dollar contract acquisition and administration as mere routine governmental action. This characterization is not in line with the allegations made in the Indictment or the sort of conduct the FCPA exempts. As such, these arguments fare no better than those the defendant in *Duperval* made.

## CONCLUSION

For the foregoing reasons it is **RECOMMENDED** that Defendant, Naman Wakil's Motion to Dismiss Indictment [ECF No. 64] be **DENIED**.

Objections to this Report may be filed with the district judge within **fourteen** (14) days of receipt of a copy of the Report. Failure to timely file objections waives a party's right to review issues related to the Defendants' plea under Fed. R. Crim. P. 11 before the District Judge or the Court of Appeals. *See* Fed. R. Crim. P. 59(b)(2); 11th Cir. R. 3-1; *Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 13th day of February, 2023.

*[signature]*

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc: **United States District Judge Kathleen M. Williams;**

**All Counsel of Record**